1
2
3
4
IN THE UNITED STATES DISTRICT COURT

5
FOR THE DISTRICT OF ARIZONA

6
7   Jose and Adelina Casillas; et. al.,          )   CV 07-395-TUC-DCB (HCE)
                                                 )
8              Plaintiffs,                        )   **REPORT & RECOMMENDATION**
                                                 )
9   vs.                                           )
                                                 )
10  United States of America,                     )
                                                 )
11             Defendant.                          )
                                                 )
12  _____)
13
14
15          Pending before the Court is: (1) Defendant's Motion to Dismiss for Lack of Subject

16  Matter Jurisdiction and for Summary Judgment (Doc. No. 31) (hereinafter "Defendant's

17  Motion"); and (2) Plaintiffs' Motion to Strike Defendant's Pleadings in Support of Motion

18  for Summary Judgment and Motion to Dismiss for Failure to State a Claim (Doc. No. 32)

19  (hereinafter "Plaintiff's Response"). For the following reasons, the Magistrate Judge

20  recommends that the District Court: (1) grant Defendant's Motion to Dismiss for Lack of

21  Subject Matter Jurisdiction; (2) deny Defendant's Motion for Summary Judgment; and (3)

22  deny Plaintiffs' Motion to Strike Defendant's Pleadings.

23  **I.      PROCEDURAL BACKGROUND**

24          Plaintiffs filed the instant action pursuant to the Federal Torts Claims Act (hereinafter

25  "FTCA"), 28 U.S.C. §§ 1346(b), 2671, 2680(h).  Thereafter, Defendant filed an Answer and

26  the instant "Motion to Dismiss for Lack of Subject Matter Jurisdiction and for Summary

27  Judgment."  In the body of the Motion, Defendants indicate that they also seek dismissal

28  pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.

1   (Defendants' Motion, pp.1, 13)

2       Plaintiffs move to strike "Defendant's pleadings to the extent that they are to be

3   considered in support of Defendant's motion for summary judgment and request to dismiss

4   for failure to state a claim" because Defendant failed to comply with LRCiv 56.1(e) and

5   because a defense under Rule 12(b)(6) is untimely.  (Plaintiffs' Response, pp.1, 4)

6       A.    LRCIV 56.1

7        LRCiv. 56.1, Rules of Practice of the U.S. District Court for the District of Arizona,

8   governs motions for summary judgment.  LRCiv 56.1(a) requires the moving party to "file

9   a statement, separate from the motion and memorandum of law, setting forth each material

10  fact on which the party relies in support of the motion."  LRCiv 56.1(a).  The Local Rule also

11  requires that:

12      Memoranda of law filed in support of or in opposition to a motion for
        summary judgment, including reply memoranda, shall include citations to the
13      specific paragraph in the statement of facts that supports factual assertions
        made in the memoranda.
14

LRCiv 56.1(e).

15      Defendant did not include a separate statement of facts but instead included the

16  statement of facts under its own heading within Defendant's Memorandum of Points and

17  Authorities.  (*See* Defendant's Motion, p. 2) Defendant's Statement of Facts (hereinafter

18  "DSOF") consists of 13 double-spaced paragraphs and is set out on approximately three

19  pages.  (Id. at pp. 2-5) Defendant's SOF is derived from deposition testimony of F.B.I. Agent

20  Tammie Kelley; an application and affidavit for search warrant (Doc. No. 31-4, pp.

21  2(application), 4 (affidavit)); and a search warrant (Doc.No. 31-4,  p.3).  Agent Kelley's

22  entire deposition, the application and affidavit for search warrant, and the search warrant are

23  attached to Defendant's Motion as Exhibits A and B.[1]  (Doc.Nos. 31-2, 31-3, 31-4)

24      Defendant concedes that it did not comply with LRCiv 56.1(e) and points out that the

25

26

27       [1]Plaintiffs have also included among the exhibits in support of their statement of facts
    Agent Kelley's complete deposition testimony and the same search warrant and affidavit
28  used by Defendant.  (Doc. Nos. 32-3, 34-3)

1    Statement of Facts was fairly brief and complied with other aspects of the Local Rule.

2    Defendant also provides the paragraph citations to the "two portions in the legal discussion

3    where there were factual references."  (Defendant's Reply to Plaintiffs' Opposition and

4    Defendant's Opposition to Plaintiffs' Motion to Strike (hereinafter "Defendants' Reply")

5    (Doc. No. 35), p. 2)

6         Although the Court does not condone non-compliance with the Local Rules,

7    Defendant has effectively cured its non-compliance with Rule 56.1(e) by providing the

8    required citations.   Given the brevity of Defendant's SOF in this matter, and given that

9    Plaintiffs have cited no prejudice due to Defendant's failure to fully comply with the Local

10   Rules, the Magistrate Judge deems Defendant's effort to cure its omission sufficient.

11   Moreover, because, as discussed *infra*, Defendant's Motion for Summary Judgment is moot,

12   Plaintiffs' argument that Defendant failed to comply with Local Rules governing motions for

13   summary judgment is moot as well.

14        B.    Timeliness of Motion to Dismiss for Failure to State a Claim

15        Plaintiffs contend that Defendant's request for dismissal for failure to state a claim

16   pursuant to Fed.R.Civ.P. 12(b)(6) is untimely.  Defendant asserts that "[i]f there is a lack of

17   subject matter jurisdiction, then there is clearly a failure to state a claim."  (Defendant's

18   Reply, p.4)  Defendant also argues that the motion to dismiss is timely under the rules

19   because such motion need not be filed prior to filing an answer.  "In any event, the central

20   focus of the [G]overnment's motion is the lack of subject matter jurisdiction based on the

21   discretionary function exception of the FTCA."  (Id.)

22        "A defense of failure to state a claim upon which relief can be granted [pursuant to

23   Fed.R.Civ.P. 12(b)(6)]...may be made in any pleading...or by motion for judgment on the

24   pleadings, or at the trial on the merits."  *Arbaugh v. Y&H Corp.,* 546 U.S. 500, 507 (2006)

25   (*quoting* Fed.R.Cvi.P. 12(h)(2)) (noting that a Rule 12(b)(6) motion may not be asserted post

26   trial).  Hence, such a motion is not untimely on the instant record.  Moreover, Defendant has

27   clarified that its citation to Rule 12(b)(6) reinforces its central argument that this Court is

28   without subject matter jurisdiction over Plaintiff's claim and thus Plaintiffs' are unable to

1    state a claim against the United States.  The defense "that a federal court lacks subject-matter

2    jurisdiction...may be raised...at any stage in the litigation, even after trial and the entry of

3    judgment."  *Id.; see also* Fed.R.Civ.P. 12(h)(3).

4    **II.    FACTUAL BACKGROUND**

5        Plaintiffs' action arises from the execution of a search warrant on January 8, 2004[2] at

6    the home of Plaintiffs Jose and Adelina Casillas.  The officers were searching for one Devin

7    Lloyd Joaquin (hereinafter "Joaquin"), who was suspected of shooting another man. (DSOF,

8    Ex. B)  Present at the Casillas' home when the warrant was executed were Jose and Adelina

9    Casillas; the Casillas' minor son; the minor daughter of Jose and Delina Casillas; the

10   Casillas' adult daughter and two of her minor children, one of whom was a toddler and the

11   other an infant.  (Complaint) Plaintiffs allege that the officers executing the warrant wore

12   black hoods, entered the home and detained Plaintiffs at gun point.  (Complaint, p. 3)  Jose

13   Casillas was handcuffed, taken outside,  made to lay face down on the ground and detained

14   at gunpoint.  (Id.)  Additionally, "Adelina Casillas and Josephina Karina Cruz were detained

15   in the living room face down while officers brandished assault weapons.  Josephina Karina

16   Cruz was forced to get down on the floor with her 3-year old daughter...and her infant son.

17   Victoria Guadalupe Casillas,...[a] minor child...was detained on the living room floor at gun

18   point."  (Id.)  A minor child, Jesus Casillas, was detained face down at gun point outside the

19   residence.  (Id.)

20       Joaquin was not found at the Casillas residence. Jose and Adelina Casillas were

21   questioned about Joaquin and they denied any knowledge of Joaquin or his girlfriend.  (Id.

22   at p. 4)  Plaintiffs allege that the Casillas residence "was and is not in the location described

---

25       [2]Plaintiffs allege that the affidavit for the search warrant reflects the requesting agent's

26   observation of a red Chevy Tahoe at the Casillas residence on "January *27*, 2004."

27   (Complaint, p.3)(Doc. No.1) The search warrant was obtained on January 8, 2004.  The

     affidavit reflects that the red Chevy Tahoe was seen at the residence on January *7*, 2004.

28   (DSOF, Ex. B, ¶9)

1    in an affidavit for a search warrant" pursuant to which the search was executed.[3]   (Id. at p.2)

2    Plaintiffs allege that they each "have suffered permanent psychological damage and

3    emotional distress."  (Id. at  p.4)

4         Plaintiffs allege a cause of action under the FTCA based upon negligence in securing

5    the warrant and  negligence in investigation and surveillance of the Casillas residence prior

6    to obtaining the warrant.  (Id.)  Plaintiff's also allege that the officers' conduct resulted in the

7    intentional torts of  false arrest and imprisonment, assault, and battery.  (Id.)

8         It is undisputed that the search warrant was obtained by F.B.I. Agent Tammy Kelley[4]

9    pursuant to an application and affidavit in support of search warrant (hereinafter "SW

10   Application" or "SW Affidavit") that she presented to a federal magistrate judge on January

11   8, 2004.  (DSOF, Ex. B)  At that time, Agent Kelley had been with the F.B.I. for nine years

12   and she was then assigned to "violent crime investigations" on the Tohono O'odham

13   Reservation.  (DSOF, Ex. B) Agent Kelley sought the warrant in an  attempt to find Joaquin

14   who had been identified as a suspect in a shooting that occurred on January 1, 2004 on the

15   Tohono O'odham reservation.  (Id.)  Joaquin was alleged to have pointed a semiautomatic

16

17   _____

18   [3]The Complaint reflects that the Casillas residence is located at:  "*937* E. Drexel
     Road."  (Complaint, p.3) (emphasis added) Plaintiffs also state that an FBI agent  applied for
19   a warrant to search: "*937* E. Drexel Road."  (Id.)(emphasis added) " However, Plaintiffs'
     statement of facts refers to "the Casillas residence located at "*930* E. Drexel Road" and
20   exhibits in the form of motor vehicle registrations  attached to Plaintiffs' Statement of Facts
     indicate Jose Casillas' address is: "930 E. Drexel."  (Doc.No. 34-2) The affidavit for search
21   warrant at issue indicated that the residence in question was located at: "930 E. Drexel
     Road," and the search warrant authorizes the search of the residence at "930 E. Drexel
22   Road." (DSOF, Ex. B) Plaintiffs have not specifically alleged that the Casillas residence was
     not located at the address indicated in the search warrant or that the residence did not match
23   the description set forth on the face of the warrant.  Instead, they cite errors in the affidavit
     in support of the search warrant that pertain to the location of the residence in relation to a
24   Dollar Store in the area and to vehicle registration information.  Given the evidence before
     this Court, the Court can only surmise that the address listed in the Complaint is in error.
25   Plaintiffs may address this issue in their objection.

26

27   [4]During the time relevant to the acts giving rise to this action, Agent Kelley's last
28   name was Canizales.  Her name has since changed. (DSOF, Ex. A, p.4)

1  handgun at the victim and "shooting four times, hit[] [the victim]...once in the leg." ( DSOF,

2  Ex. B; *see also* DSOF, Ex. A, p.7)  The victim of the shooting said that Joaquin left in a

3  white "Suburban-like" vehicle. (DSOF, Ex. A, p. 7; DSOF Ex. B) Agent Kelley understood

4  the victim's description of the vehicle to mean a white SUV. (DSOF, Ex. A, p.8)

5      On January 5, 2004, Joaquin's brother, Laden Conde, told the FBI that Joaquin was

6  staying with his girlfriend, Illagale Ochoa, at a residence in Tucson, Arizona, "diagonal"

7  from a Dollar Store located at the intersection of Park Avenue and Drexel Road. (DSOF, Ex.

8  A, pp. 8; DSOF, Ex. B) Conde also said that a red car would be in the driveway of the

9  residence.  (DSOF, Ex. A, p.12; DSOF, Ex. B) Although Agent Kelley asked Conde to

10 accompany her to the location to point out the residence, Conde refused.  (DSOF, Ex. A, p.

11 8; *see also* Id. at p.12 (Conde "would not further describe the area, the house, would not take

12 us there.") He also refused requests for additional, specific information about the red car that

13 he said would be at the residence.  (Id. at p. 12)   Conde became uncooperative and

14 "refused... to make any further statements or help us in capturing his brother."  (Id. at p.8)

15 According to Agent Kelley, Conde became uncooperative because he felt guilty about giving

16 the authorities information regarding his brother.  (Id. at pp. 8, 12)

17     Agent Kelley, and other law enforcement officers, began surveillance in the vicinity

18 of Park and Drexel.   The Dollar Store, referred to by Conde, is located on the southeast

19 corner of Park and Drexel.  (DSOF, Ex. A, p.9) When Conde told Agent Kelley that the

20 residence where Joaquin was hiding was diagonal from the Dollar Store, Agent Kelley

21 understood that to mean that the residence was located at "the northwest quadrant..."  (Id.)

22 But, "[t]here were no houses in that quadrant."  (Id.)  Instead, the northwest quadrant  was

23 a vacant field with an apartment complex to the west.  (Id. at pp. 9-10)

24     "Because no residence exactly matched the description given by..." Conde, officers

25 "set up a surveillance in the area to try to determine what house they [sic] were actually

26 talking about."  (Id. at p.10) On January 7, 2004, Agent Kelley personally observed a red

27 Chevy Tahoe in the driveway of the Casillas  residence, located at 930 E. Drexel Road which

28 is in the vicinity of the Dollar Store.  (Id. at p. 13; DSOF, Ex. B) However, the Casillas

1  residence is not diagonal from the Dollar Store.  (DSOF Ex. A, p.13)  Instead, the Casillas

2  residence is on the same side of the street and west of the Dollar Store.  (Id.)

3      Agent Kelley stated in her affidavit in support of the search warrant that Conde

4  advised that Joaquin was staying with his girlfriend, Ochoa, "at a residence located at the

5  intersection of Park Avenue and Drexel Road...diagonal from the 'Dollar Store.'"  (DSOF,

6  Ex. B, ¶7)  Agent Kelley also stated in her SW Affidavit that the residence located at 930 E.

7  Drexel Road "is in the area of Park Avenue and Drexel Road, *diagonal* from a 'Dollar

8  Store'".  (Id. at ¶9 (emphasis added))  At her deposition, Agent Kelley agreed that the Casillas

9  residence was not diagonal from the Dollar store as stated in her SW Affidavit.  (DSOF, Ex.

10  A, p. 13)  Agent Kelley explained that she did not prepare the SW Affidavit.  (Id. at p. 15, 17,

11  22)  Instead, the affidavit was prepared by Assistant United States Attorney Sean Chapman

12  (hereinafter "AUSA Chapman") based upon information Agent Kelley relayed to him over

13  the phone.  (Id. at pp. 15, 17, 30)  Agent Kelley signed the SW Affidavit and "approved it

14  for accuracy..."  (Id. at p. 22)  According to Agent Kelley, "when I proofread [the SW

15  Affidavit]..., I missed the fact that it stated...that [the residence to be searched] was diagonal,

16  and I should have caught that and corrected it, but I did not."  (Id. at p. 13)

17      A utilities check for the residence, obtained by Agent Kelley, revealed that the utilities

18  were in the name of Jose Casillas. (Id. at p. 20)  A license check of the red Chevy Tahoe

19  revealed the vehicle was registered to Jose Casillas.  (Id. at p.15; *see also* Plaintiffs' Exhibits

20  at Doc. No.34-2)  At some point, a white Chevy Tahoe was also observed at the Casillas

21  residence.  (DSOF, Ex. A, pp. 15-16; DSOF, Ex. B)  A license check showed the white

22  Chevy Tahoe was also registered to Jose Casillas.  (DSOF, Ex. A, p.15; *see also* Plaintiffs'

23  Exhibits at Doc. No.34-2)

24      Agent Kelley stated in her SW Affidavit that (1) "following the shooting,...Joaquin

25  left the scene in a white 'Suburban-like' vehicle"; and (2) Conde said a red car would be at

26  the residence where Joaquin was hiding.  (DSOF, Ex. B, ¶¶6, 8)  Agent Kelley also stated

27  in her affidavit that the red and white vehicles observed at the residence were both registered

28  to "Jose Casillas-Ochoa."  (Id. at ¶¶10,11)  Agent Kelley blames her "error in proofreading

1  the affidavit" for the inclusion of the erroneous information that the red and white vehicles

2  were registered to "Jose Casillas-Ochoa."  (DSOF, Ex. A, p. 15) Agent Kelley asserts that

3  when she called  AUSA Chapman to give him the information, "the first two vehicles [i.e.,

4  presumably the red and white Chevy Tahoes] we observed on surveillance came back to Jose

5  Casillas."  (Id. at p. 16)

6       At her deposition Agent Kelley testified that she had also seen a green Ford Explorer

7  at the Casillas residence on January 8, 2004, the day she applied for the search warrant.[5] (Id,

8  at pp. 15, 38) That green Ford Explorer was registered to "Casillas-Ochoa."  (Id. at p. 15)

9  Agent Kelly stated that she recorded the information about the green Ford Explorer in her

10 surveillance log.[6] (Id.)  Agent Kelley also testified that she informed AUSA Chapman about

11 the green Ford Explorer registered to "Casillas-Ochoa."  (Id.)  However, the SW Affidavit

12 did not include any mention of the green Ford Explorer registered to Casillas-Ochoa.  (Id.

13 at p. 16; DSOF, Ex. B) Agent Kelley further stated:

14        I did not catch when I proofread the affidavit that the AUSA had actually put
          the other two vehicles [the red and white Chevy Tahoes] maybe assuming it
15        was the hyphen–I can't speak for him–that they were all the same person but
          should not have been.  Because when I called him and gave him the
16        information, the first two vehicles we observed on surveillance came back to
          Jose Casillas.  It was the last vehicle that's not reflected in the affidavit that
17        actually came back to Jose Casillas-Ochoa, therefore, the last name of the
          girlfriend...When I proofread this, I read down through it I guess too quickly
18        and I didn't catch the fact that he did not put the green vehicle, the green SUV,
          in here.  He had described the other two SUV's [sic] with the last name of
19        Ochoa.
          ***
20        I did proofread it, and I am assuming I proofread it too quickly, and I was
          looking for certain points.  And I did not see the word diagonal or it did not
21        catch my attention, and again, I did not notice at that time that he had
          described the wrong vehicle in the affidavit.
22
   (DSOF, Ex. A, pp. 16-17) Agent Kelley stressed that she never told AUSA Chapman that the
23
   Casillas residence was diagonal from the Dollar Store or that the red and white Chevy Tahoes
24
   observed at the residence were registered to Jose Casillas-Ochoa.  (Id. at p. 30)   "I read to
25

26  _____

27        [5]Agent Kelley did not observe the occupant(s) of that vehicle.  (DSOF, Ex. A, p. 24)

28        [6]Agent Kelley's surveillance log has not been made part of the record.

1   him directly from what's on my surveillance log." (Id.) She does not know how or why the

2   information about the green Ford Explorer was omitted from the SW Affidavit. (Id. at p. 23)

3   The errors were made by AUSA Chapman and Agent Kelley did not catch the errors when

4   proofreading. (Id. at p. 31) Agent Kelley stated that it was her responsibility to proofread the

5   SW Affidavit. (Id. at p. 43)

6       Agent Kelly asserted that inclusion of the erroneous information in the SW Affidavit

7   was unintentional. (Id. at p.16) Agent Kelley opined that if the erroneous information was

8   omitted from the SW Affidavit and replaced with the statements that the residence to be

9   searched was in the vicinity of and in close proximity to the Dollar Store and that the green

10  Ford Explorer observed at the residence was registered to Jose Casillas-Ochoa, probable

11  cause would have been shown and the search warrant would have been issued. (Id. at pp. 17-

12  19) Agent Kelley was not of the opinion that the search warrant was executed based upon

13  erroneous information because she "knew the correct information based on my surveillance

14  log. At the time we executed it, apparently, because I did not proofread the affidavit clear

15  enough, I was basing my opinion on that, on my actual observation and my search log." (Id.

16  at p. 22; *see also* Id. at p. 41 ("Given the information I had at the time, I would have executed

17  the warrant on the house....I would have proofread...more carefully."))

18      If the registration of the green Ford Explorer had not indicated the name Ochoa, the

19  agents "probably would have discontinued the warrant or the surveillance....The fact that the

20  name Ochoa came back to a vehicle that was associated there lead [sic] us to believe that we

21  possibly...we were in the right location, looking at the right house." (Id. at p. 20; *see also* Id.

22  at p. 23 ("we wouldn't have proceeded had I not gotten that piece of information during our

23  surveillance" regarding the green Ford Explorer)).

24      Agent Kelley also stated in the SW Affidavit that on January 8, 2004 at 1:25 p.m., she

25  observed a male matching the description of Joaquin enter the Casillas residence. (DSOF,

26  Ex. B) At her deposition Agent Kelley stated she observed, from approximately 50 yards

27  away, a "dark complected male early 20's with short black hair approximately five foot nine."

28  (DSOF, Ex. A, p. 28) Agent Kelley opined that the man she observed was the approximate

1   age, size, build and height as Joaquin.  (Id. at p. 29) From her vantage point, Agent Kelley

2   was not able to determine whether the man was Mexican or Native American.  (Id.)  The

3   Search Warrant described Joaquin as an "Indian male; 5'9"; 180 lbs; black hair; brown eyes."

4   (DSOF, Ex. B)

5          Prior to taking the SW Application to the magistrate judge, Agent Kelley read the SW

6   Affidavit.  (Id. at p. 44) "[W]e were in quite a rush because he [the magistrate judge] was

7   kind of waiting around, the judge was waiting around for us or he had another appointment

8   or--" (Id.)

9          After obtaining the warrant, Agent Kelly per "typical procedure" called to inform the

10  Tohono O'odham SWAT team that the warrant had been signed.  (Id. at p. 23) Agent Kelley

11  was not present when the search warrant was executed.  (Id. at p. 25)

12         According to Defendant, the officers executing the warrant "apparently made a

13  'SWAT style entry' and search for the suspect..." (Defendant's Motion, p.5 *citing* DSOF,

14  Ex. A, pp. 23-25, 32) Agent Kelley testified that a SWAT style entry is "quick and abrupt

15  in an event to try to, I guess, arrest the subject if he was in there quickly before he had a

16  chance to grab a hostage.  There really is no slow way of doing that and there's really no

17  non-scary way of doing that."  (Id. at p.32) According to Agent Kelley: "we talked at length

18  about how to exactly approach this and be safe for law enforcement and the occupants, and

19  that in the end we decided that if we would not have done it quickly and in the manner we

20  did, we felt Mr. Joaquin being scared, running from the law, and a violent history, the

21  potential for a hostage situation and the injury to the occupants would have...been too high.

22  And we decided that we'd rather have scared children and people than possibly injured and

23  dead people and children."  (Id. at pp. 31-32)

24         Agent Kelley arrived at the scene after the officers who had executed the search were

25  coming out of the Casillas residence.  (Id.)  Because Agent Kelley was not present when the

26  search occurred, she does not know whether the green Ford Explorer registered to Casillas-

27  Ochoa was at that the residence during the search.  (Id. at p. 21) Nor does Agent Kelley know

28  the precise number of officers who were present during the search. (Id. at p.26)  She testified

that the search was executed solely by Tohono O'odham SWAT officers. (Id. at p. 25) When she arrived on scene, at least four Tohono O'odham SWAT officers and a minimum of two sheriff deputies were present. (Id. at p.26) When she arrived on scene, Agent Kelley saw that the SWAT officers had long guns. (Id. at p. 25)

After the search of the Casillas residence, officers continued surveillance in the area of Park and Drexel and the Dollar Store. (Id. at pp. 54-55) Agent Kelley eventually located and arrested Joaquin on January 20, 2004.[7] (Id. at p. 27) Illagale Ochoa, Joaquin's girlfriend, stated to officers that she had been driving a white SUV the night of the shooting. (Id.)  The residence where Joaquin was staying after the shooting was on the northeast quadrant of Park and Drexel, "across the street and up the road a little bit from the [D]ollar [S]tore...But...not diagonal" from the Dollar Store. (Id. at pp.46, 50) That residence belonged to Ochoa's aunt who did not have the "last name of Ochoa. There was nothing to indicate an Ochoa lived there." (Id. at p.51)

To the extent that Defendant moves for summary judgment, Plaintiffs have not filed a controverting statement of facts indicating whether Plaintiffs dispute  Defendant's SOF. *See* LRCiv 56.1(b).  "Each numbered paragraph of the statement of facts set forth in the moving party's separate statement of facts shall, unless otherwise ordered, be deemed admitted for purposes of the motion for summary judgment if not specifically controverted by a correspondingly numbered paragraph in the opposing party's separate statement of facts." *Id.*  Defendant correctly points out that "Plaintiffs did not controvert any of the [G]overnment's numbered Statement of Facts as required by Local rule 56.1(b), so they are deemed admitted pursuant to that rule." (Defendant's Reply, p.3)

**III.   STANDARD:   DISMISSAL   FOR   LACK   OF   SUBJECT   MATTER JURISDICTION**

Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, dismissal is

---

[7]While conducting surveillance in that area, officers observed and followed a white SUV which led to the apprehension of Joaquin. (DSOF, Ex. A, p. 54)

appropriate when the court lacks subject matter jurisdiction over a claim.  Fed. R. Civ. 12(b)(1). Subject matter jurisdiction involves the power of the court to hear the plaintiff's claims in the first place and, therefore, imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power.  Because federal courts are courts of limited jurisdiction, it is presumed that a cause lies outside the jurisdiction of federal courts unless proven otherwise.  *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 377 (1994).  The plaintiff bears the burden of establishing that jurisdiction exists.  *Tosco Corp. v. Communities for a Better Environment,* 236 F.3d 495, 499 (9th Cir. 2001);  *Thornhill Publishing Co. v. General Telephone & Electronics Corp.,* 594 F.2d 730, 733 (9th Cir. 1979).

"'A motion to dismiss for lack of subject matter jurisdiction may either attack the allegations of the complaint or may'" attack the existence of subject matter jurisdiction as a matter of fact.  *National Union Fire Insur. Co. v. ESI Ergonomic Solutions, LLC.,* 342 F.Supp.2d 853 (D. Ariz. 2004) *(quoting Thornhill Publishing Co.,* 594 F.2d at 733). "When a motion to dismiss attacks the allegations of the complaint as insufficient to confer subject matter jurisdiction, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Id. (citing Federation of African Amer. Contractors v. City of Oakland,* 96 F.3d 1204, 1207 (9th Cir. 1996)). Where the jurisdictional issue is separable from the merits of the case, the court may consider the evidence presented with respect to the jurisdictional issue, resolving factual disputes if necessary. *Thornhill,* 594 F.2d at 733.  "When the motion is a factual attack on subject matter jurisdiction, a defendant may 'rely on affidavits or any other evidence properly before the Court.'" *National Union Fire Insur. Co*., 342 F.Supp.2d at 861  (*citing St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989)).  In the instance of a factual challenge, no presumption of truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the court from evaluating the merits of jurisdictional claims. *Thornhill,* 594 F.2d at 733.

When a motion to dismiss is based on more than one ground, the court should consider the Rule 12(b)(1) challenge first because the other grounds will become moot if the

1    court lacks subject matter jurisdiction.  5 Charles Alan Wright & Arthur R. Miller, *Federal*

2    *Practice & Procedure,* §1350 (2004 ed.)

3    **IV.    DISCUSSION**

4          Defendant argues that the Court lacks subject matter jurisdiction over Plaintiffs'

5    claims all of which are filed pursuant to the FTCA.

6          A.    Introduction: The FTCA

7          It is well-settled that the United States can be sued only to the extent that it has waived

8    its sovereign immunity.  *Conrad v. United States,* 447 F.3d 760, 764 (9th Cir. 2006) (citation

9    omitted).  The FTCA "waives the federal government's immunity from suit for a discrete

10   class of lawsuits."  *O'Toole v. United States,* 295 F.3d 1029, 1033 (9th Cir. 2002) (*citing* 28

11   U.S.C. §§2671-2680).   The FTCA provides for governmental liability for negligent or

12   wrongful acts or omissions of a federal employee acting within the scope of his or her

13   employment "if a private person would be liable to the claimant in accordance with the law

14   of the place where the act or omission occurred."  28 U.S.C. § 1346(b); *see also* 28 U.S.C.

15   § 2674 ("The United States shall be liable...relating to tort claims, in the same manner and

16   to the same extent as a private individual under like circumstances,..."); *O'Toole,* 295 F.3d

17   at 1033. The Supreme Court has noted that "[t]he broad and just purpose which the statute

18   was designed to effect was to compensate the victims of negligence in the conduct of

19   governmental activities in circumstances like unto those in which a private person would be

20   liable and not leave just treatment to the caprice and legislative burden of individual private

21   laws."  *Indian Towing Co. v. United States,* 350 U.S. 61, 68 (1955); *see also O'Toole,* 295

22   F.3d at 1036 (*quoting  Rayonier Inc., v. United States,* 352 U.S. 315 319-320 (1957))

23   ("Congress, in adopting the FTCA, sought to prevent the unfairness of allowing 'the public

24   as a whole' to benefit 'from the services performed by Government employees,' while

25   allocating 'the entire burden' of government employee negligence to the individual,

26   'leav[ing] him destitute or grievously harmed.'").

27         The waiver of sovereign immunity under the FTCA is subject to number of

28   exceptions. *General Dynamics Corp. v. United States,* 139 F.3d 1280, 1283 (9th Cir.1998).

"If an exception applies, sovereign immunity is not waived, and no subject matter jurisdiction exists." *Id.* (*citing Sabow v. United States,* 93 F.3d 1445, 1451 (9th Cir. 1996)).  The exception to FTCA liability relevant to the instant case is the "discretionary function exception." The discretionary function exception precludes tort liability for:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise of performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a); *see also O'Toole,* 295 F.3d at 1033.

Additionally, "Congress refused to make the United States liable for certain intentional torts by federal employees, but created a limited exception to this refusal for the 'acts and omissions of investigative or law enforcement officers.'"[8] *Orsay v. United States,* 289 F.3d 1125, 1134 (9th Cir. 2002) (*quoting* 28 U.S.C. §2680(h)). With regard to intentional torts, the FTCA limits the Government's liability to instances where wrongful acts by "investigative or  law enforcement officer[s]" give rise to claims of  "*assault, battery, false imprisonment, false arrest,* abuse of process or malicious prosecution." 28 U.S.C. §2680(h) (emphasis added); *see also Arnsburg v. United States,* 757 F.2d 971, 978 (9th Cir. 1985) ("By its terms, section 2680(h) limits the liability of the United States to instances where law enforcement officials act tortiously.")    For purposes of the law enforcement proviso, "'investigative or law enforcement officer' means any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law." 28 U.S.C. § 2680(h).  "The applicability of the intentional tort exception is a question of subject matter jurisdiction...."  *Dry v. United States,* 235 F.3d 1249, 1257 (10th Cir. 2000).

Defendant advances two alternative arguments to support its position that the Court lacks subject matter jurisdiction over Plaintiffs' claims concerning negligence in

---

[8]This provision of section 2680(h) is commonly referred to as the "law enforcement proviso."

1   investigation and in securing the search warrant.  Defendant first argues that no liability

2   exists because there is no private party conduct analogous to applying for and obtaining a

3   search warrant pursuant to federal law.  (Defendant's Motion, p.6) Alternatively, Defendant

4   argues that "even if the conduct fell within the scope of the FTCA because there was a

5   private person analog,..." the discretionary function exception applies in this instance to

6   preclude jurisdiction over Plaintiffs' negligence claims.  (Id. at p. 12)

7       Defendant also argues that the Court lacks subject matter jurisdiction to address

8   Plaintiffs' intentional tort claims because those claims fall within the discretionary function

9   exception.

10          B.      Negligence Claims

11              1.      Private Part Analog

12      The FTCA imposes liability for negligent or wrongful acts or omissions by

13  government employees in the same manner and to the same extent as a private person under

14  like circumstances in accordance with the law of the place where the act or omission

15  occurred.  28 U.S.C. §§ 1346(b), 2674.  Thus, "[i]n general, the FTCA does not recognize

16  a right of action where there is no private analog." *Wright v. United States,* 963 F.Supp. 7,

17  17 (D.D.C. 1997); *see also Rayonier Inc.,* 352 U.S. at 318 (The FTCA "make[s] the United

18  States liable to petitioners for the Forest Service's negligence...if, as alleged in the

19  complaints, [the law of the state where the alleged negligence occurred]...would impose

20  liability on private persons or corporations under similar circumstances.") The Supreme

21  Court has stated that "the words 'like circumstances' do not restrict a court's inquiry to the

22  *same circumstances,* but require it to look further afield." *United States v. Olson,* 546 U.S.

23  43, 46 (2005) (*quoting Indian Towing,* 350 U.S. at 64).  However, if Plaintiffs' claims herein

24  against the United States are "not reasonably analogous to any claim for which a private

25  person would be liable in..." Arizona, then the FTCA does not apply to create  liability.

26  *Woodbridge Plaza v. Bank of Irvine,* 815 F.2d 538, 543 (9th Cir. 1987), *superseded by statute*

27  *on other grounds.*

28      Defendant argues that "[t]here is no private party analog for applying for and

- 15 -

1    obtaining a search warrant pursuant to federal law."  (Defendant's Motion, p.6) Plaintiffs
2    counter that "[a]lthough a private party cannot seek a search warrant, the Plaintiffs [sic]
3    damages in this case resulted from false arrest and imprisonment and assault and battery"
4    which are causes of action recognized under Arizona law.  (Plaintiffs' Response, p.6)
5    Plaintiffs offer no authority or argument for the premise that there is a private analog for
6    obtaining a search warrant.  Other courts that have addressed this issue have held that the act
7    of applying for a search warrant has no analogous counterpart for private citizens and, thus,
8    there is no liability under the FTCA for such action.  *See Washington v. Drug Enforcement*
9    *Admin.,* 183 F.3d 868, 873 (8th Cir. 1999); *Wright,* 963 F.Supp. at 16-17 ("the discrete act of
10   applying for such a warrant is not reviewable under the FTCA.") Plaintiffs have conceded,
11   there is no private party analog to seeking a search warrant.  (*See* Plaintiffs' Response p.6;
12   Defendant's Reply, p.4 (noting "Plaintiffs'...concession...that a private party cannot seek a
13   search warrant."))  Consequently, there is no liability under the FTCA for Plaintiffs' claim
14   of negligence in obtaining the search warrant and such claim must be dismissed.

15        2.    Discretionary Function Exception

16        It follows that just as there is no private analog to the act of applying for a search
17   warrant, there is also no private analog to the investigation leading to the decision to seek the
18   warrant.  *See Washington,* 183 F.3d at 873.   Moreover,  even if there was a private party
19   analog to such investigative activities, these activities fall within the discretionary function
20   exception.

21        When analyzing whether the FTCA's discretionary function exception under section
22   2680(a) applies, the court must first determine whether the action at issue is a matter of
23   choice for the employee such that it involves an element of judgment or choice. *Berkovitz v.*
24   *United States,* 486 U.S. 531, 536 (1988).  Section  2680(a) is not implicated "if there exists
25   a statute, regulation or policy mandating particular conduct by a government employee and
26   the statute, regulation, or policy does not allow for the exercise of discretion in fulfilling that
27   mandate."  *Conrad,* 447 F.3d at 764 (discretionary function exception does not apply where
28   government employee has no choice but to follow the mandatory directive).

"Second, once it has been determined that the challenged conduct involves an element of discretion, the question is whether the discretion is the type of decision-making that the discretionary function exception was designed to protect." *Id.* at 765 (emphasis omitted). This inquiry furthers Congress' desire in enacting the exception to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort. The exception properly construed, therefore, protects only governmental actions and decisions based on considerations of public policy." *Berkovitz,* 486 U.S. at 536-537 (*quoting United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814 (1984)); *see also United States v. Gaubert,* 499 U.S. 315, 325 n. 7 (1991) (distinguishing discretionary acts that "cannot be said to be based on the purposes that the regulatory regime seeks to accomplish..." or "grounded in...policy..." from acts that are protected under section 2680(b)); *Sabow,* 93 F.3d 1445 (decisions how to investigate, who to investigate, and how to present evidence to the proper authorities are classic examples of discretionary conduct). Thus, "[i]f the agents had 'room...to make independent policy judgments,' the 'discretionary function' exception protects them from liability." *Gasho v. United States,* 39 F.3d 1420, 1435 (9th Cir. 1994) (citation omitted), *cert. denied sub. nom. Ball v. Gasho,* 515 U.S. 1144 (1995).

Moreover, when determining whether the discretionary function exception applies, the court  must look to "the nature of the alleged wrongful conduct..." rather than the status of the actor.[9]  *Id.; see also Varig,* 467 U.S. at 813 ("[T]he basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee–whatever his or her rank–are of the nature and quality that Congress

---

[9]Emphasis on the nature of the conduct instead of the status of the actor represents a departure from prior cases where the Supreme Court had drawn a distinction between actions taken at the "planning level" and actions taken at the "operational level" of decisionmaking. *See  Gasho,* 39 F.3d at 1435. This dichotomy between planning level and operational level decisionmaking "assumed that decisions made by actors at the operational level were not immune from liability." *Id.* The Supreme Court and the Ninth Circuit "subsequently rejected this dichotomy as 'specious.'" *Id.* (*citing Varig Airlines,* 467 U.S. 797).

intended to shield from tort liability.")   The Government's failure to satisfy either the first or second part "of the two-part discretionary function test"  defeats application of the exception.  *See Sabow,* 93 F.3d at 1454 n.10.

Generally, judicial review of alleged negligent investigation by law enforcement is foreclosed by the discretionary function exception.  *See e.g. Sabow,* 93 F.3d at 1453-1454 (holding action was barred by discretionary function exception and stating:  "Although some of the actions and inactions alleged by the [plaintiffs]...represent alarming instances of poor judgment and a general disregard for sound investigative procedure, the investigative agents took discretionary action involving considerations of social and political policy."); *Mesa v. United States,* 123 F.3d 1435 (11th Cir. 1997) (affirming dismissal for lack of subject matter jurisdiction because decisions how to locate and identify subject of arrest warrant "are fundamentally rooted in policy considerations, and ...judicial second-guessing of this decision thus is not appropriate."); *Pooler v. United States,* 787 F.2d 868, 870-871(3rd Cir. 1986) (investigating officer's use of unreliable informant fell within discretionary function exception because "Congress did not intend to provide judicial review of the quality of investigative efforts" moreover "when the sole complaint is addressed...to the quality of the investigation as judged by its outcome, the discretionary function should, and we hold, does apply."); *Wright,* 963 F.Supp. at 17 (officer's intentional omission of relevant information from search warrant application fell within discretionary function exception because "identifying what evidence to submit to a judicial tribunal is discretionary..." for police officers and prosecutors); *Doherty v. United States,*  905 F.Supp. 54, 56 (D.Mass. 1995) (decision to obtain search warrant based solely on information from confidential informant which led to search of wrong residence  was not subject to judicial review because "law enforcement personnel made a judgment based upon their discretion to seek a search warrant upon the information which they had at the time" in light of "the public policy of preventing crimes by acting with expedition...."); *McElroy v. United States,* 861 F.Supp. 585, 592 (W.D. Tex. 1994) (task force's negligence in conducting preliminary surveillance which resulted in raid on wrong residence fell within discretionary function because decisions were based

1  upon "the public policy goal of punishing and deterring distribution of illegal narcotics").

2          Plaintiffs herein contend that the officers' actions were not subject to judgment or

3  choice because decisions concerning searching the homes of private citizens "necessarily

4  implicates the protections against unlawful search as [sic] seizure as guaranteed by *Article*

5  *II, Section 8 of the Arizona* [sic]. It is necessarily the policy of the FBI to avoid a course of

6  conduct which violates the 4th Amendment rights of citizens...[Agent Kelley's] inclusion of

7  erroneous and what amounted to false information in the affidavit and her alleged failure to

8  properly proof-read it does not fall into the context of discretionary conduct. That was not

9  a matter of judgment or choice." (Plaintiff's Response, p.8) (emphasis in original).

10  However, a decision is non-discretionary only where the government employee "has no

11  rightful option but to adhere to [a] directive." *O'Toole,* 295 F.3d at 1033. Thus, to be a non-

12  discretionary action, "[a] federal statute, regulation or policy [must] specifically prescribe[]

13  a course of action...." *Id.* The record is clear that Agent Kelley's investigation led her to

14  undertake surveillance to find Joaquin and/or to obtain probable cause to search the premises

15  where she thought Joaquin was sheltered. Such activity necessarily comports with the

16  constitutional concepts cited by Plaintiffs. It is also clear that the choices that Agent Kelley

17  made in carrying out the investigation, surveillance, and eventual decision to request a search

18  warrant were necessarily based on her judgment and experience.

19          Defendant stresses that "the decision to obtain the warrant under the circumstances

20  of the fast-moving investigation was based on the public policy of arresting a violent

21  offender and preventing any further crime by acting expeditiously. The suspect in [Agent]

22  Kelley's investigation had clearly committed a violent crime." (Defendant's Motion, p.11)

23          Defendant's argument is well-taken. On the facts herein, Agent Kelley's primary

24  concern was apprehending an individual on the run who was suspected of the violent offense

25  of shooting another person. Agent Kelley went to the area of Park and Drexel on the basis

26  of Conde's tip. When Agent Kelley discovered that there was no residence diagonal from

27  the Dollar Store, she undertook surveillance in that area. While conducting surveillance in

28  that area, Agent Kelley's attention was drawn to the Casillas residence by notice of a white

SUV (Chevy Tahoe) and red Chevy Tahoe at that residence.  Agent Kelley had been given information that Joaquin left the crime scene in a white SUV and Conde had told her that a red car would be at the residence where Joaquin was hiding. Both such vehicles were registered to Casillas.  The day Agent Kelley requested the search warrant, she observed at the Casillas residence: (1) a green Ford Explorer registered to Casillas-Ochoa[10]; and (2) a male of similar description to Joaquin.  Based upon the information Agent Kelley had at the time, she made the determination to seek a search warrant for the Casillas residence.  This decision "involves a judgement and a choice grounded in policy considerations regarding the enforcement of the criminal laws toward protecting the public safety." *Doherty,* 905 F.Supp. at 56. Under the instant circumstances,  the discretionary function exception applies to Plaintiffs' claims of negligent surveillance and investigation. Moreover, given the exigency of the situation, Agent Kelley's actions  in obtaining the search warrant involving the overlooked errors in the SW affidavit necessarily fall within the discretionary function exception as well.  *See Gray v. Bell,* 712 F.2d 490, 516 (D.C. Cir. 1983) ("We will not permit a suit for damages occasioned by activities that are not meaningfully separable from a protected discretionary function."); *see also  Gasho*, 39 F.3d at 1345 ("That the conduct of the agents may be tortious or motivated by something other than law enforcement is beside the point, as governmental immunity is preserved 'whether or not the discretion involved be abused.'")(*citing* 28 U.S.C. §2680(a)).

C.     Intentional Torts

Defendant argues that Plaintiffs' claims of intentional torts occurring during execution of the search must necessarily fail as well because those claims "are essentially a lawful result of the issuance of the search warrant for the premises" in light of the fact that "the

---

[10]Agent Kelley testified at her deposition that the pivotal factor in her decision to seek the search warrant was the green Ford Explorer registered to Casillas-Ochoa, which in Agent Kelley's opinion, connected the Casillas residence to Joaquin's girlfriend, Illagale Ochoa and, thus, to Joaquin who was reportedly with Ochoa.

warrant compels the search." (Defendant's Reply,  p. 5 (*citing* Fed.R.Crim.P. 41(e)(2)(A)

(subject to certain exceptions, a warrant issued by a federal magistrate judge "must command

the officer to...execute the warrant...")).  According to Defendant, "in executing the search

warrant in this case and in cooperating with the prosecutor, the FBI agent and the officers

cannot be said to have caused Plaintiffs' arrest, imprisonment and alleged assault and

battery." (Id.)  Defendant argues that to "the extent that Plaintiffs argue that the officers

exceeded the command of the search warrant in entering the premises and conducting the

search–which took only approximately fifteen minutes–Plaintiffs fail to recognize the

discretionary decisions and actions which were part and parcel of the execution of the

warrant." (Id. at pp. 5-6) Defendant also posits that because there is no private party analog

for obtaining a search warrant, section 2680(h) does not apply.  (Defendant's Reply, pp. 6-7)

Plaintiffs contend that because the warrant was executed at the direction of Agent

Kelley, the alleged intentional torts perpetrated by the Tohono O'odham SWAT team fall

within section 2680(h) which specifically prescribes liability for assault, battery, false

imprisonment or false arrest by federal law enforcement officers. (Plaintiffs' Response, p.7)

### 1.    Federal Agents

Agent Kelley did not execute the search warrant. (DSOF, Ex. A, p. 25) Instead, she

notified officers at the scene that the magistrate judge had signed the warrant.  (Id. at p.23)

Thereafter, members of the Tohono O'odham SWAT team searched the Casillas residence.

(Id. at p. 25) Agent Kelley arrived at the residence after conclusion of the search.  (Id.)

Section 2680(h) provides for liability for specified intentional tortious conduct by

"any officer of the United States who is empowered by law to execute searches, to seize

evidence, or to make arrests for violations of Federal law."  28 U.S.C. §2680(h).  *See*

*Arnsberg,* 757 F.2d 971 (FTCA limits the Government's liability to instances of wrongful

acts by law enforcement officers).  Plaintiffs do not allege that the Tohono O'odham SWAT

team who executed the search were officers of the United States empowered by law to

execute searches, seizures or to make arrests for violations of Federal law.  (*See* Plaintiff's

Response, p.7 ("despite of [sic] the fact that the search warrant was executed by members of

1   the Tohono O'odham Nation's SWAT team, this occurred at the direction of Agent Kelley.")

2   Nor does Defendant argue that liability is lacking due to the status of the SWAT officers.

3   Instead, each party bootstraps the SWAT team's conduct in executing the search to the initial

4   decision to obtain the warrant and the subsequent application process carried out by Agent

5   Kelley.   Neither party adequately explains how *the manner in which a search is conducted*

6   is tied   to the decision of a federal officer to obtain a search warrant and actions occurring

7   during the search warrant application process.

8        "Absent the power to enforce federal law, tribal officers are not federal investigative

9   or law enforcement officers." *Trujillo v. United States,* 313 F.Supp.2d 1146, 1150 (D.N.M.

10  2003) (*citing Dry,* 235 F.3d at 1257; *see also Holthusen v. United States,* 498 F.Supp.2d

11  1236 (D.Minn. 2007) (recognizing under facts of that case that tribal officers were federal

12  employees for purposes of the FTCA).  It is undisputed on this record that Agent Kelley was

13  acting within the scope of her responsibilities as a federal agent assigned to the violent crime

14  investigations on the Tohono O'odham Reservation and that the SWAT officers were in fact

15  executing a search warrant authorized by a federal magistrate judge. (DSOF, Ex. A,B)  Given

16  Defendant's omission of any defense and authority regarding applicability of the FTCA to

17  the Tohono O'odham SWAT officers, this record supports the conclusion that the Tohono

18  O'odham SWAT officers were  empowered in this instance to enforce federal law.

19                    2.      Private Party Analog and Discretionary Function Exception

20        There is little support for Defendant's assertion that Plaintiffs' intentional tort claims

21  are precluded because there is no private party analog for applying for a search warrant.  (*See*

22  Defendant's Reply, pp.6-7) Instead, "[t]here is no question that the FTCA creates a right of

23  action for torts committed during the unreasonable execution of a search warrant." *Wright,*

24  963 at 17 (*citing* 28 U.S.C. § 2680(h)) (although court held there was no private party analog

25  "to the discrete act of applying for..." a search warrant, and alternatively held that such action

26  was protected under the discretionary function exception, the court went on to consider

27  claims of trespass, intentional and negligent infliction of emotional distress, and negligence

28  arising from the manner of execution of the search); *see also Washington,* 183 F.3d 868

(recognizing there is no private party analog to application for and execution of a search warrant but nonetheless applying section 2680(h) to consider claims including assault and battery occurring during execution of a search warrant).

The Ninth Circuit has noted that the FTCA's preservation of governmental liability under section 2680(h) for intentional torts committed by law enforcement officers

> reflects a concern that these officers, unlike other federal employees, are authorized to use force and threaten government action when necessary to carry out their investigative and law enforcement duties. This authority to use force and threaten government action carries with it the risk of abuse, or the risk of intentionally tortious conduct.

*Orsay*, 289 F.3d at 1134 (section 2680(h) did not apply to workplace torts arising outside the context of investigation and law enforcement duties).[11]

Defendant argues that Plaintiffs may not maintain suit under section 2680(h) because the conduct at issue falls within the FTCA's discretionary function exception. The essence of Defendant's argument is that the discretionary function exception exempts liability for conduct for which the Government would otherwise be liable pursuant 2680(h)'s law enforcement proviso.

In "interpreting the interplay of section 2680(h) and the FTCA exceptions...", the

---

[11]The *Orsay* court also noted legislative history reflecting that the law enforcement proviso was enacted to "remedy the 'injustice' of holding 'the Federal Government...harmless if a federal narcotics agent intentionally assaults [a] citizen in the course of an illegal 'no knock' raid'..." *Orsay*, 289 F.3d at 1135 (*quoting* S.Rep. No. 93-588, 93d Cong.2d Sess. 3 (1973), *reprinted in* 1974 U.S.Code Cong. & Admin. News. 2789, 2792 (1974) (hereinafter "S.Rep. 93-588")). The Senate Committee report discussing the law enforcement proviso recognized that "[f]or years scholars and commentators have contended that the Federal Government should be liable for the tortious acts of its law enforcement officers when they act in bad faith or without legal justification." S.Rep. 93-588. According to the Senate Committee report, the law enforcement proviso was intended to "submit the Government to liability whenever its agents act under color of law so as to injure the public through search and seizures that are conducted without warrants or with warrants issued without probable cause. However, the Committee's amendment should not be viewed as limited to constitutional tort situations but would apply to any case in which a Federal law enforcement agent committed the tort while acting within the scope of his employment or under color of Federal law." *Id.*

Ninth Circuit has agreed with Defendant's position. *Gasho,* 39 F.3d at 1433.  The Ninth Circuit has been clear that if the Government shows that the tortious conduct alleged under section 2680(h) is exempt under one of the FTCA's enumerated exceptions to liability, then the plaintiff's claim is barred.[12]   *Id.* (dismissing, in part, claims filed pursuant to law enforcement proviso because alleged conduct fell within either the FTCA exception exempting liability regarding detention of goods by customs agents and other alleged conduct fell within the discretionary function exception).  The Ninth Circuit recognized that such a holding "effectively bars any remedy for intentional torts with respect to..." conduct falling within the FTCA's enumerated exceptions to liability, "[b]ut statutes waiving the sovereign immunity of the United States must be 'construed strictly in favor of the sovereign.'" *Id.* (*quoting McMahon v. United States,* 342 U.S. 25, 27 (1951), *superseded by statute on other grounds*).  The *Gasho* court  concluded that "[o]ur holding furthers Congress' intention in creating the..." FTCA exemptions. *Id.*  Thus, Defendant is correct and the Ninth Circuit has been clear that the liability created by the law enforcement proviso is subject to the FTCA's discretionary function exception:  "If a defendant can show that the tortious conduct involves a 'discretionary function,' a plaintiff cannot maintain an FTCA claim, even if the discretionary act constitutes an intentional tort under section 2680(h)." *Gasho,* 39 F.3d. at 1435 (dismissing intentional infliction of emotional distress/malicious intent claim regarding agents' investigation and preparation of case for prosecution because such actions fell within discretionary function exception *but* declining to dismiss intentional infliction of emotional distress claim with regard to "[t]he agents' conduct during the arrest..." where question of fact remained whether arresting officers were motivated by malice).  However, while a discretionary decision is immune from liability "whether or not the discretion involved be abused'", *Gasho,* 39 F.3d at 1436 (*quoting* 28 U.S.C. 2680(a)), it is quite another matter to

---

[12]The converse is also true: "If the [G]overnment fails to show that the tortious conduct is exempt, the plaintiff's claim is not barred assuming the plaintiff demonstrates that an 'investigative or law enforcement officer' committed the intentional tort.'" *Gasho,* 39 F.3d at 1433.

act entirely outside the bounds of the policy considerations supporting application of the discretionary function exception. *See e.g. Patel v. United States,* 806 F.Supp. 873, 876 (N.D. Cal. 1992) (while certain actions when executing search warrant to obtain evidence were based on considerations rooted in public policy concerns, the officers' decision to burn structure down was "not based on considerations rooted in social, economic or political policy..." given that such decision destroyed the very evidence the officers were seeking); *see also Sutton v. United States,* 819 F.2d 1289, 1293 (5th Cir. 1987)[13] (government agent who departs from the duties of an investigator and embarks on an intentional abuse within the meaning of section 2680(h) similarly exceeds the scope of his authority and acts outside his discretion); *McElroy,* 861 F.Supp. at 593 n.15, 594 (following Sutton; recognizing that decisions made during an arrest that are based purely on the officer's judgment and experience remain protected by the discretionary function exception of the FTCA; and declining to dismiss claims of excessive force during execution of search warrant on wrong premises because "arresting officers know they must take care not to violate a suspect's civil rights by using excessive force.").

The facts herein are that after probable cause was established, Agent Kelley "called and informed" the SWAT team that the warrant to search the residence had been signed. (DSOF, Ex. A, p. 23)There is no suggestion that these officers should have questioned the validity of the warrant. *See Arnsberg,* 757 F.2d at 981 (It would be "unreasonable to rule that the arresting officers...must take issue with the considered judgement of an assistant United States Attorney and the federal magistrate.") The purpose of the search was to apprehend Joaquin who was suspected of using a semiautomatic handgun to shoot someone. After shooting his victim, Joaquin was on the run. There is no question that "[t]he decisions made and the actions taken by the officers in the course of serving the search warrant did involve

---

[13]The *Gasho* court cited *Sutton* as being "*contra*" to the premise ultimately adopted by the Ninth Circuit that "a plaintiff must first clear the 'discretionary function' hurdle" in order to maintain an FTCA claim for an intentional tort under section 2680(h). *Gasho,* 39 F.3d at 1433.

matters of judgment or choice.  The officers at the scene clearly had a choice as to what specific actions to take in the course of serving the warrant."  *Patel,* 806 F.Supp. at  878.

As Defendant persuasively points out, the challenged actions in executing the search involved decisions grounded in policy given that the officers were concerned with "how best to ensure public safety–and the occupants of Plaintiffs' residence–in apprehending a violent offender."  (Defendant's Reply, p.7)

> An agent must be acutely aware of the risks involved in the execution of the warrant to himself, his fellow agents, innocent bystanders, not-so-innocent bystanders, and to the subject himself.  Likewise, the decisions surrounding whether to execute an arrest warrant at night or during daylight hours, or whether to execute inside a house or outside, or with force or without, involve profoundly difficult policy or judgment considerations.  These decisions simply are not the equivalent of decisions a government agent makes about what road to take when driving a car on official business.  These investigative decisions involve policy choices and plainly fall within the discretionary function exception to the FTCA.

*Mesa v. United States,* 837 F.Supp. 1210, 1216 (S.D. Fla. 1993) ("the execution of an arrest warrant is a fundamental discretionary investigative determination replete with policy choices and therefore... the sovereign has not waived its immunity under the FTCA."), *aff'd on other grounds,* 123 F.3d 1435 (11th Cir. 1997).[14]  Similar decisions and policy concerns were at issue with regard to the execution of the search warrant in the instant case.

Detective Kelley's unchallenged testimony is that:

> we talked at length about how to exactly approach this and be safe for law enforcement and the occupants, and that in the end we decided that if we would not have done it quickly and in the manner that we did, we felt Mr. Joaquin being scared, running from the law, and a violent history, the potential for a hostage situation and injury to the occupants would have...been too high.  And we decided that we'd rather have scared children and people than possibly injured and dead people and children.

(DSOF, Ex. A,  pp. 31-32)  The decisions the SWAT officers made involved exercise of

---

[14]In light of the posture of the case on appeal, the Eleventh Circuit did not need to "decide whether all actions taken in deciding when and how to execute an arrest warrant are subject to the discretionary function exception.  Instead, we address the narrower question of whether the process of locating and identifying the subject of an arrest warrant is within the discretionary function exception."  *Mesa,* 123 F.3d at 1437 n.3.  (holding that the investigation of the whereabouts and identity of the subject of an arrest warrant prior to service of the arrest warrant is conduct that falls within the discretionary function exception.)

1    judgment in light of important policy considerations.

2         Plaintiffs claim that they were detained at gun point: Josephina Karina Cruz was

3    forced to get down on the floor with her three year old daughter and infant son; another

4    minor child (age unknown) was detained on the floor at gun point; Jose Casillas was

5    handcuffed, taken outside, made to lay face down on the ground and detained at gunpoint;

6    and another minor child (age unknown) was detained face down at gunpoint outside the

7    residence as well. Plaintiffs have not cited conduct by the SWAT officers which would

8    suggest that the officers' actions when  executing the search warrant were outside policy

9    concerns as to how best to ensure public safety, officer safety, and the safety of those inside

10   the Casillas residence, including Joaquin had he been there, under the circumstances.  On the

11   instant facts, the tortious actions allegedly undertaken by the SWAT officers herein "are too

12   intertwined to be sufficiently separated from the initial decision..." as to how to execute the

13   search under the circumstances.  *Gray,* 712 F.2d at 516.  Although the SWAT-style manner

14   of execution of the search herein was  undoubtedly shocking and frightening to Plaintiffs,

15   there are no allegations that the officers used excessive force or improper tactics in

16   conducting the search such that the officers' conduct was outside the scope of the public

17   policy concerns at issue under the given circumstances. *Compare Mesa,* 123 F.3d at 1439

18   (affirming dismissal for lack of subject matter jurisdiction where "[t]he appellants have

19   pointed to no act of these DEA agents that could fall outside of the discretionary function

20   exception, nor have the appellants pointed to any requested discovery that could reasonably

21   be expected to reveal any such act.") *and Gray,* 712 F.2d at 516 (no liability under FTCA

22   "for damages occasioned by activities that are not meaningfully separable from a protected

23   discretionary function.") *with  Sabow,* 93 F.3d at 1454 (although officers'  judgments

24   involving social, economic, or political considerations were shielded from liability for

25   negligent failure to follow investigative procedure regarding the death of plaintiff's relative,

26   officers' decision to berate plaintiff and to investigate plaintiff's medical license when

27   plaintiff threatened to "publicly air" concerns did "not involve considerations of social,

28   economic, or political policy of the type Congress intended to shield from FTCA actions.");

1   *Gasho,* 49 F.3d at 1436 (although dismissal of intentional infliction of emotional distress

2   claim was justified under the discretionary function exception to the extent the claim rested

3   on prosecutorial decisions, plaintiffs permitted to proceed on intentional infliction of

4   emotional distress claim to the extent that question of fact remained whether the agents'

5   conduct during plaintiffs' arrest was motivated by malice).

6       The Court is not unsympathetic to Plaintiffs' plight and exposure to such aggressive

7   conduct within the walls of their own home and  through no fault of their own.  Moreover,

8   the Court is mindful that the determination whether officers' actions  in executing a search

9   warrant fall within the FTCA's discretionary function exception requires careful

10   consideration of the relevant facts and policy considerations on a case by case basis.

11   Otherwise, the discretionary function exception would swallow the FTCA's waiver of

12   sovereign immunity and would eviscerate the very purpose for which section 2680(h) was

13   amended to include  liability for intentional torts committed by law enforcement officers.

14       Further, this Court has not overlooked that other court opinions that have been cited

15   herein have considered the merits of FTCA claims alleging liability under section 2680(h)

16   with regard to officers' execution of search and arrest warrants.  *See Washington,* 183 F.3d

17   at 874-858 (whether officers' conduct in executing search warrant constituted assault or

18   battery under applicable state law); *Wright,* 963 F.Supp. at 17-20  (whether officers' conduct

19   in executing search warrant constituted, *inter alia,* intentional or negligent infliction of

20   emotional distress or trespass under applicable state law).  These courts, however, did not

21   discuss the interplay of section 2680(h) and the discretionary function exception.

22       The Third Circuit, like the Ninth Circuit in *Gasho,* stated that a cause of action under

23   the FTCA, including a cause of action for intentional torts under section 2680(h), "can only

24   be maintained if it is first shown that the government actor was not exercising discretion."

25   *Pooler v. United States,* 787 F.2d 868, 872 (3rd. Cir. 1986).  The *Pooler* court found it "hard

26   to imagine instances in which the activities of officers engaging in searches, seizures or

27   arrests would be anything other than *operational*."  *Id.* (emphasis added) (dismissing FTCA

28   action "because no federal officer is charged with a tort in the course of a search, a seizure,

1   or an arrest warrant" and claims of unlawful arrest and unlawful prosecution were subject to

2   the discretionary function exceptions). *Pooler* was decided when the Supreme Court's test

3   for the discretionary function exception relied in part upon the distinction between planning

4   level and operational level decisions.  That distinction is no longer applicable.  *See Gasho,*

5   39 F.3d at 1435.  Now, courts look to the nature of the alleged wrongful conduct, not the

6   status of the actor.  *Id.*[15]

7        At first blush it appears that the result herein contravenes the very purpose of the law

8   enforcement proviso. *See supra,* at n.11 (discussing legislative history).  However, it is well-

9   settled that "statutes waiving the sovereign immunity of the United States must be construed

10  strictly in favor of the sovereign." *Gasho,* 39 F.3d at 1434.  When strictly construed in light

11  of the discretionary function exception, the waiver of immunity in section 2680(h) applies

12  only to tortious conduct not involving discretionary functions.  The Ninth Circuit has

13  approved of construing the FTCA's exceptions  and 2680(h) in this manner.  *Id.* at 1434-

14  1436.

15  **V.    CONCLUSION**

16       There is no private party analog to seeking or applying for a search warrant and even

17  if there were, the Government is immune under the FTCA's discretionary function exception

18  from Plaintiffs' claims of negligence in investigation, surveillance, and application for the

19  search warrant.  Moreover, the discretionary function exception also bars Plaintiffs' claims

20  _____

21       [15]The law enforcement proviso was enacted in 1974, when the dichotomy between

22  operational level and planning level decisionmaking was a determining factor in applying the
    discretionary function exception.  The Supreme Court has since departed from that test to

23  focus on the nature of the conduct rather than the status of the actual decisionmaker.  If
    Congress' intent was to render conduct falling within the discretionary function exception

24  actionable under section 2680(h), then it is up to Congress to expressly provide for such
    liability.  Unless and until Congress acts, the courts are left to interpret the interplay of the

25  discretionary function exception and the law enforcement proviso in such "a manner that

26  reconciles them, without doing violence to either" and all the while paying heed to the
    mandate that waivers of sovereign immunity of the United States must be strictly construed

27  in favor of the sovereign. *Gahso,* 39 F.3d at 1433.

28

1   of intentional torts occurring during execution of the search warrant.   Because all of

2   Plaintiffs' claims are barred, the Court lacks subject matter jurisdiction and Defendant's

3   Motion to Dismiss for Lack of Subject Matter Jurisdiction should be granted.   Given that

4   subject matter jurisdiction is lacking, Defendant's Motion for Summary Judgment is moot.

5   **VI.   RECOMMENDATION**

6   For the foregoing reasons, the District Court should:

7   (1)   deny Plaintiffs' Motion to Strike Defendant's Pleadings in Support of

8   Summary Judgment and Motion to Dismiss for Failure to State a Claim (Doc.

9   No. 32);

10   (2)   grant Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction

11   (Doc. No. 31); and

12   (3)    deny Defendant's Motion for Summary Judgment as moot.

13   Pursuant to 28 U.S.C. §636(b), any party may serve and file written objections within

14   ten days after being served with a copy of this Report and Recommendation.  A party may

15   respond to another party's objections within ten days after being served with a copy thereof.

16   Fed.R.Civ.P. 72(b).  If objections are filed, the parties should use the following case number:

17   If objections are not timely filed, then the parties' right to *de novo* review by the

18   District Court may be deemed waived.  *See United States v. Reyna-Tapia,* 328 F.3d 1114,

19   1121 (9th Cir.) (*en banc*), *cert. denied,* 540 U.S. 900 (2003).

20   DATED this 11th day of February, 2009.

21

22

23   _____

Héctor C. Estrada
United States Magistrate Judge

24

25

26

27

28